[L.A. No. 30816. Dec. 22, 1978.]

PATRICIA ANN MILLER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
HARRY MAURICE MILLER, Real Party in Interest.

## COUNSEL

Dietsch, Gates, Morris & Merrell and Brownell Merrell, Jr., for Petitioner.

Brigitte M. Bodenheimer as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Ball, Hunt, Hart, Brown & Baerwitz and Albert H. Ebright for Real Party in Interest.

## OPINION

**CLARK, J.**—Patricia Ann McGuinness, formerly Patricia Ann Miller, seeks writ of mandate to compel respondent court to vacate its order of 10 December 1976 directing her to deliver to her former husband, Harry M. Miller, custody of their two minor children pursuant to an Australian custody decree.

Patricia and Harry were married in California in 1962. After living in New Zealand, they moved to Australia in 1964 where their two children were born. On 9 February 1967 the marriage was dissolved in Australia, the court awarding custody to Patricia with visitation rights to Harry. Denying application for change of custody in 1967, the court restrained both parents from removing the children from Australia without leave of court, required the parents' passports to be delivered to their attorneys, and provided that should Patricia leave Australia Harry would be entitled "forthwith" to custody.

With Harry's agreement and subject to visitation, Patricia moved to Los Angeles with the children in 1968. In 1972 Patricia remarried and moved to Australia with her present husband, an Australian citizen, and the two children. About the same time she and Harry entered another agreement providing for Harry's visitation rights and for his arranging all schooling. Harry also remarried in 1972.

Pursuant to the 1972 agreement, Harry enrolled one of the children, Miles, as a weekly boarder in a private school in Sydney. From 1972 to March 1976, the parties shared custody during holiday periods, and

Harry had custody of the children for three six-week periods while Patricia was on foreign trips.

In 1976 Patricia, without consulting Harry, changed Miles' enrollment to that of a day student. Harry filed an application for custody of both children, or in the alternative, for joint custody with Miles attending school as a weekly boarder, Harry continuing to be responsible for schooling arrangements, each parent having specified access rights. Finally, Harry sought sole custody should Patricia leave the area.

On 19 March 1976, following extended hearings, the court ordered, over Patricia's objection, that Harry have custody of the children for three weeks while Patricia went abroad.

When Patricia returned the parties entered an agreement. In accordance with the first five paragraphs of the agreement, the court on 3 May ordered that Patricia have custody of the children, that Harry have access alternate weekends from Friday night to Monday morning and certain specified holidays and school vacations, that Harry pay child support, and that the parties have general liberty to apply to the court on all matters on seven days' notice.

Although the court order did not set forth the next four paragraphs of the agreement, the court "noted" the further provisions in the agreement. Those paragraphs provided in part that Harry would have custody during any period Patricia was out of Australia without the children, Harry would be responsible for school arrangements, and the parties would give one month's notice through counsel of any overseas trips involving the children.

Patricia's solicitors remained her solicitors of record. Between 25 May and 16 July the solicitors for the parties exchanged a dozen letters relating to child support, visitation, and trips.

In July 1976, Patricia decided to permanently leave Australia with the children. Deliberately failing to inform either Harry or the court of her intention, she departed on 23 July while the children were in the middle of a school term.

On 27 July Harry was informed by school officials that the children had not been in school since 22 July. His efforts that day and the next to learn of the whereabouts of Patricia and the children were fruitless.

Harry's solicitor telephoned the office of Patricia's solicitors on 27 July. The solicitor who had represented Patricia, Mr. Twigg, was out of Sydney and communications on the 27th and 28th were with his partner, Mr. Doolan. Mr. Doolan was unable to locate Patricia and so advised Harry's solicitor the following morning.

On 28 July Harry's solicitor filed an application in the Australian court seeking custody and an order restraining Patricia from leaving Australia and compelling her to surrender the children's passports. In support of the application, Harry filed an affidavit stating that the children had been taken out of school; that his efforts to locate Patricia and the children had been unsuccessful; that she could be a "very emotional person" and capable of conduct detrimental to the children; that if there was discord in her existing marriage, she might leave for America; and that in view of her behavior in early 1976, she was not a fit and proper person to have custody of the children without the stabilizing influence of her present husband.

Copies of the application and affidavit were served on Patricia's solicitors at 12:40 p.m., 28 July. Mr. Doolan stated that he had been unable to locate Patricia and had no specific instructions, requesting Harry's solicitor to so advise the court.

At 2:45 p.m., 28 July the court, after hearing the matter ex parte, signed an order awarding temporary custody of the children to Harry. The order was made returnable on 3 August 1976. The order was served on Patricia's solicitors. Mr. Twigg advised Harry's solicitor on 29 July that he had no knowledge of Patricia's whereabouts, that she and her second husband had separated, and that the latter was also unaware of where she might be.

On 3 August Patricia failed to appear and there was no request for continuance. The court issued warrants for the custody of the children.

On 22 October 1976 Harry initiated contempt proceedings in the Los Angeles Superior Court. Evidence was presented that under Australian law notice could be served on the solicitor of record and that in cases of urgency the court could issue ex parte custody orders. The superior court determined that the orders of 3 May and 28 July were valid and that Patricia had deliberately violated them. The court ordered Patricia to deliver custody of the children to Harry and to pay his attorney fees, travel, and other expenses.

While aware of the Australia court orders by 9 August, Patricia has made no effort to reopen the Australian proceedings, to appeal, or to seek modification of the order.

Civil Code section 5172, part of the Uniform Child Custody Jurisdiction Act, provides: "The general policies of this title extend to the international area. The provisions of this title relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons."

Patricia contends that she was not given reasonable notice and opportunity to be heard in the Australian proceedings and that the Australian custody order should be denied enforcement because its purpose assertedly was to punish her for removing the children from Australia.

Prior to the 1963 enactment of the provision now found in Civil Code section 4809, California law provided that, when there was an attorney of record, motions to modify custody were to be served on the attorney (Code Civ. Proc., § 1015). The provision was held constitutional because it is "established that the Legislature may provide that once the court has jurisdiction over the subject matter of a proceeding and over the person of the party affected, it may bind such person by orders made after he has left the state." (*Reynolds* v. *Reynolds* (1943) 21 Cal.2d 580, 583 [134 P.2d 251]; see 38 State Bar J. 639 (1963).) Although the Legislature has changed the rule, the former practice did not constitute unreasonable notice. In addition, it must be pointed out that Patricia's solicitors were still acting on her behalf respecting the 3 May order as late as 16 July, 12 days before the service of the 28 July application.

More importantly, Patricia's contentions are based on a mischaracterization of the Australian orders of 28 July and warrants of 3 August. It is obvious that the order was not intended to effect a permanent change in custody. Rather, it provided a change of custody with a return date. The order contemplated that Harry would have custody pending a hearing and determination whether he or Patricia should have custody. The period contemplated for Harry's custody was short, at most six days if Harry was successful in immediately locating the children. The interim order far from denying Patricia a right to be heard, is designed to permit

Patricia full right to be heard on the custody issue—a right still available to her before the Australian court.

Code of Civil Procedure section 527 provides for temporary restraining orders to be granted ex parte returnable in a short period. In *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 913 [122 Cal.Rptr. 877, 537 P.2d 1237] this court held that in First Amendment cases, the party seeking the restraining order must make a reasonable. effort in good faith to give notice, in either formal or informal fashion, to either the defendant or his counsel. The court recognized that the hearing will often be held promptly—perhaps immediately. (*Id.,* at pp. 913-914.) A concurring and dissenting opinion suggests that the requirement of reasonable efforts to give notice should apply in all cases, including custody cases. In any event, it is clear that counsel was served with the application and reasonable attempts were made to locate Patricia.

Section 527 requires that "great or irreparable injury" must appear before a temporary restraining order will issue without notice. Earlier in 1976, litigation had been triggered before the Australian court by Patricia's changing school attendance, assertedly in violation of her agreement with Harry that he would be responsible for all school arrangements for the children. In settlement of that litigation Patricia had again agreed that Harry would have responsibility for all school arrangements. Withdrawing the children from school without Harry's consent as shown by his affidavit was an apparent violation of her agreement. In addition, in the absence of some explanation or excuse, withdrawal of young children from school and their continued absence must be viewed as presumptively detrimental to the children. Harry's affidavit also provided reasonable cause to believe that Patricia had left Australia in violation of the 30-day notice provision of the agreement and her disappearance with the children would frustrate performance of the visitation rights ordered by the court. Irreparable harm was shown by the affidavit.

One main factor to be considered by a judge in determining whether to issue an interim restraining order without full contested hearing is the severity of the injunctive restrictions sought. (*United Farm Workers of America* v. *Superior Court, supra,* 14 Cal.3d 902, 914.) Harry had previously been given substantial custodial rights. Under the 3 May order he was entitled to custody on alternate weekends from Friday night to Monday morning, on certain holidays, and for extensive periods during vacations and Patricia's trips abroad. In

the light of Harry's extensive custodial rights the order granting him custody pending further hearing of the custody issue may not be considered a severe restraint.

We are satisfied that the Australian court order granting Harry custody pending further hearing of the custody issue did not involve a deprivation of reasonable notice and opportunity to be heard. Because of the temporary nature of the order, there is no basis to the claim that the Australian court intended to punish Patricia.

Our conclusion that the Australian court order granting Harry custody pending further proceedings should be enforced in California has the effect of determining that further hearings may be held in Australia to modify the Australian custody orders. Such result is in full accord with the purposes of the Uniform Child Custody Jurisdiction Act. (Civ. Code, § 5150 et seq.)[1]

The alternative writ is discharged and the peremptory writ denied.

Mosk, J., Richardson, J., and Manuel, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

Petitioner, Patricia Ann McGuinness (formerly Miller), seeks a writ of mandate to compel the Superior Court of Los Angeles County to vacate its order of December 10, 1976, directing her to deliver to her

---

[1]Civil Code section 5150 provides: "(1) The general purposes of this title are to: [¶] (a) Avoid jurisdiction competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being. [¶] (b) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child. [¶] (c) Assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state. [¶] (d) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child. [¶] (e) Deter abductions and other unilateral removals of children undertaken to obtain custody awards. [¶] (f) Avoid relitigation of custody decisions of other states in this state insofar as feasible. [¶] (g) Facilitate the enforcement of custody decrees of other states. [¶] (h) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child. [¶] (i) To make uniform the law of those states which enact it. [¶] (2) This title shall be construed to promote the general purposes stated in this section."

former husband, Harry Maurice Miller, custody of their two minor children pursuant to a custody decree of the Family Law Court of Australia.[1] She contends that the Australian decree awarding custody of the children to the father is not entitled to recognition and enforcement by California because (1) the decree was issued without compliance with the due process requirements of the Uniform Child Custody Jurisdiction Act (Civ. Code, § 5150 et seq., hereafter the Act) and the Fourteenth Amendment to the United States Constitution and (2) the decree was punitive in that it was issued to punish her rather than to serve the best interest of the children. Since the first contention disposes of the issue, it is not necessary to consider the second.

I

Patricia, a native-born United States citizen, and Harry, an Australian citizen, were married in California on October 23, 1962. Following the marriage, they lived in New Zealand until 1964, when they moved to Australia. The two children of the marriage, Miles, now age 14, and Justine, now age 12, were born in Sydney, Australia. The children are citizens of both Australia and the United States because of the status of their parents' citizenship at the time of their birth. (8 U.S.C. § 1401(a)(7).)

The marriage was dissolved in Australia on February 9, 1967. At that time, the Australian court granted custody of the children to Patricia with visitation rights to Harry. In May 1967 Harry applied to the Australian court for custody of the children. The court denied his application and again awarded custody of the children to Patricia and visitation rights to Harry. The decree explicitly restrained both Harry and Patricia from taking the children out of Australia without leave of the court and required the passports of the parents to be delivered to their respective attorneys. The court further ordered that in the event Patricia left Australia, Harry would "become entitled forthwith" to custody of the children.

In May 1968, with Harry's approval, Patricia moved with the children to Los Angeles. They agreed that Harry could visit the children in Los Angeles at any time upon reasonable notice, and later when the children

---

[1]Petitioner first sought relief from the Court of Appeal, which issued an order to show cause but thereafter denied relief. This court then granted her petition for hearing.

were older, they could visit Harry in Australia.[2] On April 14, 1972, Patricia married her present husband, also an Australian citizen. Following the marriage, Patricia, her husband and her two children moved to Australia.

On April 26, 1972, in Australia, Harry and Patricia executed a written agreement. The agreement provided that Patricia would retain custody of the children but if Patricia were out of Australia "without the children," the children would stay with Harry. The agreement also provided that Harry would have visitation rights on alternate weekends and certain holidays and that he would be responsible for the schooling arrangements of the children. The agreement was not made part of any court order and referred neither to the 1967 custody decree nor to the informal agreement between Harry and Patricia in effect while Patricia lived in the United States.

Harry and Patricia abided by the April 1972 agreement until February 1976, when they were unable to resolve a dispute over the schooling arrangements for Miles. In January 1974 Harry had enrolled Miles as a weekly boarder in a private school in Sydney, pursuant to the 1972 agreement. However, in February 1976 Patricia, without consulting Harry, terminated Miles as a weekly boarder and enrolled him as a day student.[3]

Upon learning of Patricia's actions, Harry filed an application on February 24, 1976, in the Australian Family Law Court for custody of both the children, or in the alternative, for joint custody with Patricia pursuant to the following conditions: (1) that Miles attend school as a weekly boarder, Justine as a day student; (2) that Harry continue to be responsible for all schooling arrangements for the children; (3) that certain access rights be granted both parents; and (4) that Harry have sole

---

[2]As a member of the board of directors of an Australian airline, Harry is entitled to free transportation, and he experienced no difficulty in visiting the children in Los Angeles on numerous occasions during this period.

[3]Patricia, in a declaration signed under penalty of perjury and filed in the superior court, states that her action was motivated by a desire to remove Miles from an environment which was causing him physical as well as mental distress. She states that while Miles was a weekly boarder he often had colds and other ailments due to the lack of proper heating in the dormitories, and that his school work suffered because of his unhappiness. Patricia points out that his grades and his health improved after being enrolled as a day student. Patricia further states that she and Miles repeatedly attempted to persuade Harry to terminate Miles as a weekly boarder. Harry, however, felt that Miles needed the discipline provided in that setting and refused to approve.

custody of the children should Patricia leave the state of New South Wales or, at most, the country of Australia.

The hearing on Harry's application was set for March 18, 1976, but later continued until May 3, 1976. On March 12, 1976, Patricia advised Harry that she and her husband planned to be out of Australia for three weeks beginning March 19, 1976. Patricia proposed to leave the children with her housekeeper and Patricia's 24-year-old brother. Harry objected, and this dispute was presented to the Family Law Court on March 18 and 19, 1976. Patricia argued that Justine refused to go to Harry's house and that Miles would not go without his sister.[4] The court ordered that Justine be examined by a social worker to determine if she in fact did not want to go to Harry's home. The social worker reported that Justine was willing to go "for a day or so and then review the situation." The court then ordered Patricia to deliver the children to Harry for the three weeks she was to be out of Australia.

After Patricia returned to Australia, another agreement (referred to as the "Short Minutes") was negotiated in response to Harry's February 24, 1976, application for sole custody or conditional joint custody. On May 3, 1976, that agreement was presented to the court, which issued the following order:

"UPON APPLICATION made to the court this day IT IS ORDERED:—

"1. That orders be made in terms of paragraphs 1, 2, 3, 4, and 5 of the document titled 'Short Minutes' dated 3rd day of May 1976 and filed herein as set out hereunder:—

"1. Mother to have custody of children, Miles and Justine.

"2. Father to have access alternate weekends Friday night to Monday morning and holidays as below, if father unable to take access he to give notice on Tuesday prior to Friday night.

"3. Holiday access as follows:—

"(i) Mother to have May school holidays

---

[4]Patricia alleged that Justine refused to go to Harry's home because, during a previous visit there, Harry had "interrogated her [Justine] in an abusive manner concerning her birthday party which had occurred some three months before. Miles was told to stay in another bedroom and heard Justine struggling with [Harry]. [Harry's present] wife, Wendy interceded to stop further abuse of Justine by [Harry]."

"(ii) Father to have September school holidays

"(iii) Christmas holidays—half to each party, alternating each year, father to take first half 1977.

"NOTE Parties agree that Christmas 1976 children to accompany mother overseas and be returned to father for last two weeks.

"4. General liberty to apply on all matters on 7 days notice.

"5. Father to pay direct to mother maintenance $20 per week per child together with education expenses inclusive of school uniforms and requisites, otherwise usual order.

"That the maintenance ordered to be paid pursuant to Order Number 1 subparagraph 5 herein continue until each of such children respectively shall have attained the age of eighteen (18) years or until the death of the husband whichever event shall first occur and that the first of such payments be made within seven (7) days of this date and that payments be made weekly thereafter.

"AND THE COURT NOTED the agreement contained in paragraphs 6, 7, 8, and 9 of the said 'Short Minutes'."[5]

On July 23, 1976, Patricia and the children left Australia for Los Angeles. She did not notify Harry. On July 27, 1976, Harry learned from school administrators that the children had not been in school since July 23d. He was unable to locate Patricia on that day or the following day.[6]

---

[5] The paragraphs of the "Short Minutes" which the court noted but did not incorporate in the order are as follows:

"6. Note that mother agrees that children stay with father during any periods when she is out of Australia without them.

"7. Note that father shall be responsible for all schooling arrangements for the children. Father and mother undertake to comply with reasonable directions of school authorities. Father shall consult with the mother (through their respective legal advisers) concerning any proposed changes in educational situation.

"8. Note that parties to give each other at least one month's notice (through their respective legal advisers) of any proposed overseas trip involving the children including itineraries.

"9. Note—Parties agree to supply each other, through the children, with copies of school reports or school notices as supplied to children."

[6] In the declaration which she filed in the superior court, Patricia states that she telephoned her present husband's secretary on July 28th and instructed her to inform Harry that she and the children were in the United States. Patricia states that this information was conveyed to Harry on the same day.

On July 28, 1976, Harry filed with the court an application and affidavit[7] requesting that custody of the children be granted to him, that Patricia be restrained from removing the children from the jurisdiction of the court, and that the children's passports be surrendered to Patricia's attorneys. Copies of the application and affidavit were delivered at 12:40 p.m. on July 28th to the law firm of the attorney who had represented Patricia at the May 3d hearing. He was not in Sydney at the time of service and did not learn of the hearing on that date. At 2:35 p.m. on July 28th, the matter was heard ex parte, and an order was signed at 2:45 p.m. awarding custody of the children to Harry. The order was made returnable on August 3, 1976, at which time, in another ex parte proceeding, warrants were issued for the custody of the children.

On August 9, 1976, in a telephone conversation between Harry and Patricia, Patricia first learned of the July 28th proceeding. On October 22, 1976, Harry initiated the present proceeding in the Superior Court of Los Angeles County in the form of an order to show cause re contempt pursuant to the Uniform Child Custody Jurisdiction Act. The order to show cause sought recognition and enforcement of the May 3, 1976, and July 28, 1976, decrees of the Family Law Court of Australia.

On December 10, 1976, the superior court found that Patricia had wilfully disobeyed both decrees of the Australian court and ordered that both be enforced. The court further directed her to deliver custody of the children to Harry and to pay his attorneys' fees, travel and other expenses. This writ petition ensued.

## II

In 1973, the Legislature adopted the Uniform Child Custody Jurisdiction Act[8] (Civ. Code, § 5150 et seq.), which sets forth the provisions by

---

[7]The affidavit alleged, in pertinent part, that "[Patricia] can be a very emotional person and in an excited or upset state is capable of conduct that would be extremely detrimental to the best interests of the children and their future emotional stability.

"[Patricia] has the means and knowledge to travel overseas on short notice and I am concerned that if there has been discord in her existing marriage she may have left the country or be planning to depart in the immediate future. [Patricia] has previously resided for lengthy periods in America and I am concerned that she may return to America with the children.

"In view of the behavior of [Patricia] in relation to arrangements for the children in the early part of the year 1976, I do not consider that without the stabilizing influence of her present husband [Patricia] is a fit and proper person to have the care and control of the children, Miles and Justine. The child, Justine, especially is a sensitive impressionable child and it is essential for her future welfare that she be contained in regular routine and subject to careful discipline."

[8]The Act, as adopted by this state, is substantially similar to the proposed Uniform Child Custody Jurisdiction Act drafted by the National Conference of Commissioners on

which the courts of this state are to be governed when asked to enforce or modify a custody decree of a sister state. However, the provisions of the Act are extended to decrees of foreign nations by Civil Code section 5172 only *if* due process has been accorded to all affected persons: "The general policies of this title extend to the international area. The provisions of this title relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons."

In *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652], the United States Supreme Court set forth the guidelines for compliance with due process: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information [citation], and it must afford a reasonable time for those interested to make their appearance [citations]."

As to how much time should be afforded interested parties to make their appearance, the Supreme Court has held that they must be given time to retain counsel, prepare a defense and journey to the site of the proceeding. "In the case of a witness subpoena the command of the writ is that the party served shall lay aside all his business and excuses, and make his way to the court with the utmost dispatch, or at least present himself upon the return day of the writ. An ordinary summons, however, . . . contemplates that the party served may have other business of equal or greater importance engaging his attention, or may require time for the retainer of counsel and the preparation of his defense. [¶] . . . 'The time appointed must always allow sufficient opportunity, between the service of the summons and the time of appearance, to enable the party to prepare his defense and for his journey; and the justice should in this respect take care to avoid any supposition of improper hurry . . . .' " (*Roller* v. *Holly* (1900) 176 U.S. 398, 409 [44 L.Ed. 520, 525, 20 S.Ct. 410] [held five days' notice was constitutionally insufficient where it required four days of travel to reach site of proceeding]; see also *United States* ex

Uniform State Laws and approved by the American Bar Association in 1968. The National Conference is composed of Commissioners from each of the states, the District of Columbia and Puerto Rico. The Act is not a reciprocal law and is applied in California whether or not the foreign jurisdiction has adopted it.

rel. *Turner* v. *Fisher* (1911) 222 U.S. 204 [56 L.Ed. 165, 32 S.Ct. 37] [held notice on the attorney of record a few hours before a proceeding did not satisfy due process requirements].)

In the present case, Patricia was neither personally served with, nor did she have actual notice of the July 28, 1976, proceeding changing custody of the children to Harry. The only attempt to notify her of the July 28th hearing was made by delivering Harry's affidavit and application for change of custody to Mr. Twigg's office, the attorney who had represented Patricia at the May 3d proceeding, only one hour and fifty-five minutes before the hearing. However, prior to the hearing, Harry's counsel was informed that Mr. Twigg was not in Sydney,[9] that Patricia had discharged Mr. Twigg after the May 3d hearing and that Mr. Twigg's office had no instructions to represent Patricia in any new litigation. Even if it were assumed that Mr. Twigg was still Patricia's attorney of record and, therefore, authorized to accept service on her behalf,[10] the notice attempted in this case was clearly insufficient to satisfy the constitutional notice requirements of due process. Notice of less than two hours can hardly be deemed to "afford a reasonable time for those interested to make their appearance . . . ." (*Mullane* v. *Central Hanover Tr. Co., supra,* 339 U.S. at p. 314 [94 L.Ed. at p. 873].) On the contrary, the notice attempted was no more than "a mere gesture," (*id.,* at p. 315) calculated to deprive Patricia of reasonable time in which to prepare a defense and appear to present her objections.

Moreover, the procedure followed in this case was contrary to the express provisions of the Family Law Act of Australia. That act provides that a hearing may not be set until at least 14 days after the filing of an application for a change of custody if the party sought to be served is in Australia, or at least 42 days after filing if the adverse party is out of Australia.[11]

---

[9]Mr. Twigg did not learn of the action until after the order had been signed.

[10]Under California statutory law, service upon the attorney of record is not sufficient notice of a proceeding to modify a custody decree. Civil Code section 4809 provides: "After the entry of a final judgment decreeing the dissolution of the marriage or the legal separation of the parties, or after a declaration of void or voidable marriage, or after a permanent order in any other proceeding in which there was at issue the custody, support, maintenance, or education of a minor child, no modification of such judgment, order, or decree, and no subsequent order in such proceedings shall be valid unless any prior notice otherwise required to be given to a party to the proceeding be served, in such manner as such notice is otherwise permitted by law to be served, upon the party himself. For such purpose, service upon the attorney of record shall not be sufficient."

[11]Regulation 38 of section 123 of the Family Law Act of Australia provides in pertinent part: "(1) Subject to these Regulations, the date for the hearing of an application shall be

To explain his failure to comply with this notice requirement, Harry attempts to rely on the urgency provisions of the Family Law Act of Australia. He contends that these emergency provisions and the fact that the July 28th order was made returnable five days later render it valid even though granted ex parte.[12] Although Harry cites no authority for what constitutes an emergency under Australian law, he urges that under section 527 of the Code of Civil Procedure[13] the July 28th order was valid even without notice to Patricia. He states that sufficient facts were presented to show that great or irreparable injury would have resulted before the matter could have been fully noticed and heard.

Under section 527, notice may be dispensed with where "from *facts shown* . . . great or irreparable injury would result to the applicant before the matter can be heard on notice." (Italics added.) In *McKay* v. *Retail Auto. S. L. Union 1067* (1940) 16 Cal.2d 311, 320 [106 P.2d 373], this court stated that "[i]t is a fundamental principle that the drastic sanctions of equity may not be invoked without a detailed showing of *specific facts* justifying such relief." (Italics added.) The only "facts" before the Australian court on July 28th were the allegations contained in Harry's affidavit (fn. 7, *ante*). The affidavit alleged that Patricia "can be a very

fixed by the registrar of the court in which the application is filed and shall be— . . . (b) . . . (i) where the respondent is in Australia—at least 14 days from the date of filing the application; or (ii) where the respondent is out of Australia—at least 42 days from the date of filing the application."

[12]Regulation 42 of section 123 of the Family Law Act of Australia provides in pertinent part: "In case of emergency, a court may make an *ex parte* order—(a) concerning the welfare or custody of, or access to, a child of the marriage. . . ."

[13]Section 527 of the Code of Civil Procedure provides in pertinent part: "(a) An injunction may be granted at any time before judgment upon a verified complaint, or upon affidavits if the complaint in the one case, or the affidavits in the other, show satisfactorily that sufficient grounds exist therefor. A copy of the complaint or of the affidavits, upon which the injunction was granted, must, if not previously served, be served therewith.

"No preliminary injunction shall be granted without notice to the opposite party; nor shall any temporary restraining order be granted without notice to the opposite party, unless it shall appear from facts shown by affidavit or by the verified complaint that great or irreparable injury would result to the applicant before the matter can be heard on notice. In case a temporary restraining order shall be granted without notice, in the contingency above specified, the matter shall be made returnable on an order requiring cause to be shown why the injunction should not be granted, on the earliest day that the business of the court will admit of, but not later than 15 days or, if good cause appears to the court, 20 days from the date of such order. When the matter first comes up for hearing the party who obtained the temporary restraining order must be ready to proceed and must have served upon the opposite party at least two days prior to such hearing, a copy of the complaint and of all affidavits to be used in such application and a copy of his points and authorities in support of such application . . . ."

emotional person and in an excited or upset state is capable of conduct that would be extremely detrimental to the best interests of the children and their future emotional stability." However, it contains no specific instances of misconduct to support these allegations. Nor does the transcript of the July 28th hearing show that Harry presented any additional facts to the court[14] to support his allegation of Patricia's emotional instability or to show that Patricia had ever done anything that was detrimental to the children, even if she were "capable" of such conduct. Harry had made similar allegations against Patricia in a 1967 modification hearing, which he had initiated. However, the court rejected those allegations and reaffirmed custody of the children in Patricia. Moreover, less than a year after the 1967 hearing, Harry approved Patricia's move to California with the children, an action which calls into question the factual basis for his allegations of her instability. On May 3, 1976, less than three months before the July 28th hearing, the Australian court again granted custody of the children to Patricia, as it had consistently done since the dissolution of the marriage nine years earlier. In so doing, the court rejected Harry's explicit request that the prior order be modified to grant him sole or joint custody in the best interest of the children.

Harry's affidavit further alleges a "concern" that there might be "discord" in Patricia's existing marriage[15] and that she is not to be considered a "fit and proper person to have the care and control of the children" without the "stabilizing influence of her present husband." Again, no facts were presented to support these allegations either in the affidavit or at the hearing.

The majority opinion would nevertheless condone the manifest lack of compliance with due process on the ground that the threat of great or irreparable injury was shown by Harry's affidavit. (Maj. opn., *ante,* at p. 929.) It finds such irreparable injury on the bases that (1) Patricia had violated her agreement with Harry by withdrawing the children from school, (2) the children's continued absence from school is "presumptively" detrimental, (3) there was reasonable cause to believe Patricia had left Australia and (4) Harry's visitation rights were frustrated by Patricia's departure. (Maj. opn., *ante,* at p. 929.) However, none of these asserted bases can justify the drastic sanctions of section 527, for the majority

---

[14]In fact, Harry did not personally appear at the July 28, 1976, hearing.

[15]Patricia is still married to her present husband, and they are residing together with the children in California.

opinion points only to acts which either had already occurred, do not amount to irreparable injury within the meaning of that section, or were not alleged in Harry's affidavit, nor considered by the Australian court in issuing the July 28th order.

In *Blake* v. *City of Eureka* (1927) 201 Cal. 643, 661-662 [258 P. 945], this court stated: " 'An injunction lies only to prevent threatened injury and has no application to wrongs which have been completed' [citation]. 'The office of a writ of injunction, as its name imports, is peculiarly a preventative and not a remedial one; it is to restrain the wrongdoer, not to punish him after the wrong has been done or to compel him to undo it' [citations]." (Accord *Blackmore Investment Co.* v. *Johnson* (1931) 213 Cal. 148, 150-151 [1 P.2d 978].) Thus, Patricia's withdrawal of the children from school cannot serve to justify the lack of compliance with due process pursuant to the provisions of section 527, for the record is clear that this act had already occurred at the time the July 28th order was issued.

As to the continued absence of the children from school, Harry's affidavit did not allege that he feared Patricia intended to keep the children out of school. There is also nothing in the transcript of the proceedings in the Australian court to indicate that the court even considered this possibility in issuing the July 28th order. Additionally, it is noteworthy that Harry did not assert, either in the trial court, the Court of Appeal or in this court, the continued absence of the children from school as a basis for the ex parte order. Section 527 specifically states that no temporary restraining order shall be granted "without notice to the opposite party, unless it shall appear from *facts shown* . . . that great or irreparable injury would result . . . before the matter can be heard on notice. . . ." Since the record is completely devoid of any evidence that Patricia intended to keep the children out of school, the majority's assertion that the threat of great or irreparable injury was shown by Harry's affidavit is unjustifiable.

As to Harry's visitation rights, the majority opinion does not indicate how the temporary impairment of the exercise of those rights, pending a full hearing after reasonable notice, would have resulted in irreparable harm in order to justify the ex parte order under section 527. If Harry's visitation rights were frustrated by Patricia's departure, his remedy was obvious under the provisions of the Family Law Act of Australia: a full hearing on the issue of custody following 14 days' notice if Patricia were in Australia or 42 days' notice if she were not. Instead, Harry, by

circumventing these notice requirements, attempted and succeeded in obtaining custody of the children—something he had not been able to do in a nine-year history of contested hearings following notice.[16]

The only matter of "urgency" raised at the July 28th hearing was the possibility that Patricia might leave Australia with the children. However, that urgency was met by the provisions of the ex parte order mandating delivery of the passports of the children to Patricia's attorney and prohibiting Patricia from removing the children from Australia. The record is devoid of any facts to show that the children or Harry were in danger of suffering irreparable harm if Harry were not immediately awarded custody. There is a similar lack of evidence that Patricia had ever done anything remotely detrimental to the best interest of the children. Resolution of the issue of custody could well have waited until reasonable notice had been afforded Patricia.

The fact that the order was made returnable five days later was not calculated to give Patricia adequate notice to appear. The transcript of the July 28th hearing shows that Harry's attorney had no reasonable expectation of serving Patricia during that time:

"His Honour: When can I make it returnable?

"Mr. Delaney: It is almost impossible.

"His Honour: I can make it returnable for the 3rd August but you won't have served her by then.

"Mr. Delaney: Perhaps if we make it Tuesday and the message gets through to her—

"His Honour: . . . I mark the application returnable for the 3rd August at 11 a.m." This exchange indicates that the August 3d date was chosen as

---

[16]It should be noted that refusal to enforce the July 28th ex parte order does not preclude further hearings in Australia on the issue of custody. Under the Act, this state could not assume jurisdiction to modify the May 3d Australian order, since at the time the present proceeding was initiated in this state California was not the children's home state. (Civ. Code, § 5152, subd. (1)(a)(ii); see also Civ. Code, §§ 5155, 5156 and 5169.) Refusal to recognize and enforce the July 28th order would have the effect of placing the parties where they were at the beginning of the present proceeding. It would, however, prevent the children from being wrenched from the custody of their mother, with whom they have lived since the dissolution of the marriage, until, after a full contested hearing, the Australian court determines that it is in their best interest that they live with their father in Australia.

a matter of expediency rather than as a genuine attempt to afford Patricia adequate notice with an opportunity to appear. If Harry had been seriously motivated by a desire to provide Patricia with proper notice, he would have urged the court to continue the matter at least 14 days, as required by Australian law.

Moreover, the fact that the order was made returnable five days later cannot be used to bootstrap the validity of the ex parte order. Section 527 provides a limited exception to the constitutional right to reasonable notice in cases of emergencies to prevent great or irreparable injury. It is the only exception. However, when the facts alleged are insufficient to show that such an emergency existed, characterizing the order as temporary in nature, subject to challenge on the return date, does not cure the due process defect of the ex parte order. As the United States Supreme Court has stated: "[N]o later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. 'This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone.' " (*Fuentes* v. *Shevin* (1972) 407 U.S. 67, 82 [32 L.Ed.2d 556, 570-571, 92 S.Ct. 1983], citing *Stanley* v. *Illinois* (1972) 405 U.S. 645, 647 [31 L.Ed.2d 551, 556, 92 S.Ct. 1208]; *Armstrong* v. *Manzo* (1965) 380 U.S. 545, 551 [14 L.Ed.2d 62, 66, 85 S.Ct. 1187]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13].) Since no exigency existed, the July 28th order is void, for it deprived Patricia of the custody of her children, a right "ranked among the most basic of civil rights . . ." (*In re B.G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244]), without affording her reasonable notice and an opportunity to be heard.

Harry further contends that if Patricia was not afforded adequate notice, it was due to her "illegal" conduct in removing the children from Australia in violation of the May 3d order and the July 28th order. However, when Patricia left Australia on July 23d, the only order in effect was the May 3d order. Under that order, Patricia *was* the custodial parent, and the order did not specifically prohibit Patricia from leaving Australia with or without the children.

The lack of such an express prohibition in the May 3d order is significant when compared to the 1967 order which was in effect up to the time the May 3d order was issued. The 1967 order specifically restrained Patricia from leaving Australia with the children without leave of the court. In addition, Harry's application initiating the May 3d hearing had

explicitly requested that Patricia be prohibited from removing the children from Australia or the state of New South Wales. Yet, neither the five directives of the May 3d order nor the balance of the agreement which the court noted contains an explicit prohibition on Patricia's movements.

The visitation provisions of the May 3d order cannot be interpreted to impliedly prohibit Patricia from leaving Australia with the children. The provisions of items 6 and 8 of the "Short Minutes" indicate that (fn. 5, *ante*) no such implication was intended. Item 6 states that the "mother agrees that children stay with father during any periods when she is out of Australia *without* them." (Italics added.) Item 8 notes that the parents agree to give "each other at least one month's notice . . . of any proposed overseas trips involving the children. . . ." Both items would be super-fluous if the visitation provisions were meant to prohibit Patricia from leaving Australia.

As to the July 28th order, Patricia left Australia on July 23d. Therefore, she could not have violated that order by taking the children from Australia, since that order had not yet been issued at the time she left.

Thus, the only "illegal" conduct which can be attributed to Patricia is that she may have violated the visitation provisions of the May 3d order and her agreement to give Harry one month's notice of any overseas trips with the children. However, this conduct cannot be used to legitimize the due process defects of the July 28th order.

It has, nevertheless, been suggested that because Patricia violated the visitation provisions of the May 3d order, the July 28th order should be enforced despite the lack of compliance with due process. This argument is based on a variant of the equitable doctrine of "clean hands" which has been developed in a series of child custody cases. However, in this area the clean hands doctrine has only been invoked to bar reexamination of a sister state custody decree when a parent who is *not* entitled to custody seeks modification of a decree. (See *Ferreira* v. *Ferreira* (1973) 9 Cal.3d 824, 834-835 [109 Cal.Rptr. 80, 512 P.2d 304].) Courts have declined reexamination in order to discourage noncustodial parents, who were unhappy with an existing decree, from abducting their children in an effort to obtain a more favorable decision in another jurisdiction. In the past, such forum shopping had been encouraged by the fact that many states have exercised jurisdiction to modify out-of-state custody decrees based on the mere presence of the child in the state.

The Act itself was designed to prevent this type of forum shopping. (See Commissioners' Prefatory Note, 9 Uniform Laws Ann. (Master ed. 1973) pp. 99-102.)[17] Civil Code section 5152, subdivision (2),[18] states that the mere presence of the child in the state is insufficient to confer jurisdiction. In section 5157,[19] the clean hands doctrine is codified.

However, neither the clean hands doctrine as it existed prior to the enactment of the Act, nor section 5157, may be used to validate the July 28th order, which was issued without compliance with due process. When

[17] " 'Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. . . . This is particularly true where the statute proposed by the commission is adopted by the Legislature without any change whatsoever and where the commissions' comment is brief, because in such a situation there is ordinarily strong reason to believe that the legislators' votes were based in large measure upon the explanation of the commission proposing the bill.' " (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

[18] Section 5152 provides:

"(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

"(c) The child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent.

"(d)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), (c), or another state had declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

"(2) Except under paragraphs (c) and (d) of subdivision (1), physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

"(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

[19] Section 5157 provides in pertinent part: "(2) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction if this is just and proper under the circumstances."

Patricia left Australia, she was the custodial parent. She did not abduct her children in order to seek a more favorable forum in which to relitigate the custody issue. Patricia did not initiate the present proceeding in order to modify the decree granting custody to Harry. Rather, Harry initiated the proceeding to enforce that order.

The July 28th order was not entitled to be enforced because it was issued without giving Patricia reasonable notice and an opportunity to be heard. The only order which was entitled to enforcement under the due process requirements of the Act was the May 3d order. In that order, Patricia retained the custody of the children as she had since the dissolution of the marriage.[20] The fact that Patricia may have violated the visitation provisions of the May 3d order may not be used to circumvent the express provisions of the Act which mandate recognition and enforcement of custody decrees of foreign nations only if reasonable notice and an opportunity to be heard have been given to all affected persons. The notice attempted in relation to the July 28th order does not meet the due process standards of the Fourteenth Amendment to the federal Constitution. "[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." (*Mullane* v. *Central Hanover Tr. Co., supra,* 339 U.S. at p. 315 [94 L.Ed. at p. 874].) In a matter of such compelling importance as the custody of children, it is imperative that all parties be given a reasonable opportunity to be heard. The record in this case discloses no justification to excuse the manifest lack of compliance with procedural due process.

The Australian court's July 28th decree was not entitled to recognition and enforcement pursuant to the Uniform Child Custody Jurisdiction Act.

Tobriner, J., and Newman, J., concurred.

Petitioner's application for a rehearing was denied January 17, 1979. Bird, C. J., and Tobriner, J., were of the opinion that the application should be granted.

---

[20]It is difficult to understand the trial court's action in enforcing both the May 3d and the July 28th order, since enforcement of one would conflict with enforcement of the other.