[Civ. No. 18601. Fourth Dist., Div. One. Oct. 3, 1979.]

FRANKLIN P. PALM, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
REBECCA S. PALM, Real Party in Interest.

COUNSEL

Donnelley & Hulden and Charles S. Haughey, Jr., for Petitioner.

No appearance for Respondent.

Michael R. Avery and Thomas S. Szakall for Real Party in Interest.

OPINION

COLOGNE, J.—Petitioner Franklin P. Palm seeks a writ of "prohibi-tion/mandate" to compel the Superior Court of San Diego County to vacate its order and stay further proceedings in exercise of jurisdiction in a disputed child custody matter instituted by Rebecca Palm Moody in her complaint to establish a North Dakota divorce decree. That 1974 decree gave Rebecca custody of the parties' minor son who was then a year and a half old. Franklin seeks to stay these proceedings during the pendency of hearings concerned with the son's custody currently being conducted in the North Dakota courts. Franklin contends California's Uniform Child Custody Jurisdiction Act (Uniform Act) which North Dakota also adopted[1] requires the superior court to decline jurisdiction over the minor child and instead to abide by North Dakota's determination of the son's custodial fate.

Franklin married Rebecca in 1968. The parties separated in August 1974 and Rebecca moved to San Diego. When Franklin took the child back to North Dakota, she returned to North Dakota to regain custody. Franklin obtained a judgment of divorce on December 16, 1974, in the District Court of Cass County, Fargo, North Dakota. At that time, the North Dakota court awarded custody of their son to Rebecca with the right of reasonable visitation given to Franklin. In March 1976, Rebecca began living with a man named Ross Moody. On December 31, 1976, by stipulation, the parties agreed Franklin could have custody of the son for six months, after which time the custody would go to Rebecca with Franklin to have the right of reasonable visitation, eight consecutive weeks of visitation in the summer plus alternating Christmas and Easter holidays. Franklin took the boy for the agreed six months and immediate-ly afterward kept the boy for the additional eight weeks to which he was entitled. On July 14, 1977, Franklin filed a petition in the district court seeking an order to show cause why he should not have the son's custody.

---

[1] All references to sections of the Uniform Act are in the California Civil Code unless otherwise designated. The Uniform Act may be found in section 5150 et seq. The language of the Uniform Act adopted by California and North Dakota (N.D. Century Code, §§ 14-14-01 to 14-14-26) is not significantly different as it relates to the issues raised in this case.

The matter was heard on August 19, both parties appearing in court personally and through counsel. On September 27, the court made an order amending the judgment to award Rebecca custody provided if she "resumes cohabitation with one Ross Moody, custody of the minor child . . . shall be changed" to Franklin.

Rebecca then took the son with her and the two lived in California where he began school. At this same time, she resumed cohabitation with Moody though at the time he was still married to another. On October 11, 1977, she "married" him and sent a certified copy of the marriage certificate to the court "in order to satisfy the order of the North Dakota Court." She admitted later this was tantamount to "fraud and deceit on the North Dakota court" because Moody was not yet free to marry. Since that time, however, Moody did obtain a divorce from his wife, the "marriage" to Rebecca was annulled and he legally married her.

In April 1978, Rebecca brought an action in California to establish the foreign judgment and to modify visitation. The superior court refused to exercise jurisdiction over the matter and dismissed the complaint with prejudice.

In June 1978, Franklin took the son back to North Dakota for his eight-week visitation period.

On August 14, before the end of that period, Franklin obtained an order to show cause from the North Dakota court for the purpose of securing full custody of the child. He obtained temporary custody and a temporary restraining order was issued to prohibit interference with his custody.

On August 18, Rebecca filed a second complaint against Franklin in San Diego seeking to establish the California court's jurisdiction over the issue of child custody, visitation and child support. On September 18, the court below determined California did have jurisdiction, California was the domiciliary of the child, it is the most convenient state to try the matter of custody, Rebecca has legal custody under the most recent North Dakota decree, the pending change of custody proceedings in North Dakota are not in substantial conformity with the Uniform Child Custody Jurisdiction Act, and the previous action of the California court dismissing Rebecca's action is not res judicata. It ordered Franklin to dismiss his North Dakota change of custody action, to refile it here and to transfer

custody of the child to Rebecca to whom it advanced temporary custody pending a hearing on change of custody.

We are advised in November 1978, the son was picked up at school in North Dakota by his maternal grandmother and taken to California where he now resides with them at a place not revealed to Franklin and contrary to the California court order, he has not been allowed visitation privileges. Franklin characterizes this as an "abduction," Rebecca says the son "voluntarily left school." We take judicial notice of the fact North Dakota now has completed hearings on this matter. On May 8, 1979, that court granted full custody to Franklin subject to a right of visitation by Rebecca under Franklin's supervision. The court later adjudicated Rebecca in contempt for failure to appear with the child, punishment to be meted out when she appears before the North Dakota court.

The situation we review is a classic example of the interstate conflict which the Uniform Act was intended to obviate.[2] Although both California and North Dakota have adopted the Uniform Act, we are faced here with courts in absolute conflict, California exercising jurisdiction and awarding the child to the mother, a resident of this state, and North Dakota exercising jurisdiction and awarding the child to the father, a resident of that state. The jurisdictional facts are not in dispute and if

---

[2]Section 5150 of the Uniform Act reads as follows: "(1) The general purposes of this title are to:

"(a) Avoid jurisdiction competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being.

"(b) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child.

"(c) Assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state.

"(d) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child.

"(e) Deter abductions and other unilateral removals of children undertaken to obtain custody awards.

"(f) Avoid relitigation of custody decisions of other states in this state insofar as feasible.

"(g) Facilitate the enforcement of custody decrees of other states.

"(h) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this state and those of other states concerned with the same child.

"(i) To make uniform the law of those states which enact it.

"(2) This title shall be construed to promote the general purposes stated in this section."

the work of the Commission on Uniform State Laws and the respective state Legislatures is to have any relevance, this jurisdictional dispute should be resolved.

A state acquires jurisdiction under the provisions of section 5152. This reads in pertinent part as follows: "(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

. . . . . . . . . . . . . . . .

"Home state" is defined in section 5151 as "the state in which the child immediately preceding the time involved lived with . . . a parent . . . for at least six consecutive months . . . . Periods of temporary absence of any of the named persons are considered as part of the six month or other period."

█ Under the facts of this case, the child was clearly within the jurisdiction of the California courts under the provisions of section 5152, subdivision (1)(a), since he was with his mother in California continuously from August 1977 to June 1978, with the exception of the visit with his father at Christmas. This period, immediately before the commencement of these proceedings, qualifies California as the child's "home state."[3] A

---

[3] The court found the child was "domiciled" in California, a fact not necessary to finding jurisdiction (see Commissioner's Notes to § 3 of the Uniform Act (our § 5152); Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, (1969) 22 Vand.L.Rev. 1207, 1224-1226).

California court has the right to determine its jurisdiction (*Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 302 [109 P.2d 942, 132 A.L.R. 715]), and the superior court properly did so here.

■ Under the Uniform Act's provisions paralleling section 5152, subdivision (1)(b), North Dakota might well have determined it too has jurisdiction over the custody of the child. The courts of North Dakota could and properly did find it was in the best interests of the child[4] to assume jurisdiction because the child and the father had a significant connection with that state and the requirement of available evidence concerning the child is met. The evidence supporting such a finding may be seen from the fact the father is a resident of that state, maintains his home and business as a dry wall contractor in Fargo; the parties last lived together as man and wife there and obtained their divorce there giving that court jurisdiction to award custody in the first instance, their reputation and relationships are well established in that community; and the child lived there for 10 of the last 22 months and even attended school there at least until his removal by the grandparents. During that period, the child obviously made contacts with neighbors, friends, and others who could testify as to his behavior and adjustment. There is available in North Dakota substantial evidence concerning the child's present or future care, protection, housing and personal relationships.

Additionally, it should be noted the court in North Dakota which granted the dissolution has continuing jurisdiction over custody matters. This is the state of the law for California courts as well (Civ. Code, § 4600;[5] *Clark* v. *Superior Court,* 73 Cal.App.3d 298, 304 [140 Cal.Rptr. 709]; N.D. Century Code, § 14-05-22; *Moran* v. *Moran* (N.D. 1972) 200 N.W.2d 263).

Faced with a similar factual situation, though one not involving competing exercise of jurisdiction, the Court of Appeal in *Smith* v. *Superior Court,* 68 Cal.App.3d 457 [137 Cal.Rptr. 348], held California had jurisdiction of the custody question on the basis of the Uniform Act which controls over the more general continuing jurisdiction provision of

[4]Jurisdiction exists only if it is in the *child's* best interest, not merely the interest or convenience of the contending parties (see Commissioner's Notes to § 3 of the Uniform Child Custody Jurisdiction Act).

[5]Section 4600 provides in part, "In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding, or *at any time thereafter,* make such order for the custody . . . ." (Italics added.)

Code of Civil Procedure section 410.50, subdivision (b).[6] In that case, the parties obtained a judgment in California dissolving their marriage. The mother received custody. She remarried and eventually moved to Oregon with the child. They lived there approximately five years, then entered a stipulation concerning custody and visitation, including a visit during Easter 1976. The judgment was modified according to the stipulation. The mother, on the child's strenuous resistance, and on the advice of a psychologist in Oregon, refused to send the child to California for the Easter visitation. The father sought an order of contempt against the mother in California. The trial court determined it had jurisdiction to modify the judgment and to hold the mother in contempt; it was affirmed on appeal.

In *Smith,* the reviewing court conceded Oregon was the "home state" of the child under the provisions of section 5152, subdivision (1)(a). The court concluded, however, under section 5152, subdivision (1)(b), the child had equal or stronger ties to California and "there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships" in spite of the fact he had been absent for five years. The court relied on the language of the statute, the Code Commissioner's Notes and the facts, as earlier stated, among which were the facts the child's grandparents lived in San Francisco and his relatives there had a good relationship with him. It noted there is additional significance in the fact the parties themselves had submitted the issue of the child's custody and visitation rights to the California court and, while that does not confer jurisdiction, an inference may be reasonably drawn the parties themselves considered the ties to California are stronger. (*Smith* v. *Superior Court, supra,* 68 Cal.App.3d 457, 464-465, fn. 3.)

By analogy it may be said, just as in *Smith* where California assumed jurisdiction though it was not the "home state" of the child, North Dakota also has the right to assume jurisdiction. North Dakota's jurisdiction in the case before us rests on the same basis as did California's jurisdiction in *Smith.*

It is apparent under the Uniform Act both California, as the home state, and North Dakota have jurisdiction over the custody of this child. The question remaining is which state should exercise it.

---

[6]Code of Civil Procedure section 410.50, subdivision (b), provides: "Jurisdiction of the court over the parties and the subject matter of an action continues throughout subsequent proceedings in the action."

██ The Uniform Act authorizes a court to relinquish jurisdiction or to stay proceedings in favor of the proceedings in the court of a sister state if it finds it is an inconvenient forum[7] or if there is misconduct.[8] Our

---

[7]Section 5156 reads as follows: "(1) A court which has jurisdiction under this title to make an initial or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.

"(2) A finding of inconvenient forum may be made upon the court's own motion or upon motion of a party or a guardian ad litem or other representative of the child.

"(3) In determining if it is an inconvenient forum, the court shall consider if it is in the interest of the child that another state assume jurisdiction. For this purpose it may take into account the following factors, among others:

"(a) If another state is or recently was the child's home state.

"(b) If another state has a closer connection with the child and his family or with the child and one or more of the contestants.

"(c) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state.

"(d) If the parties have agreed on another forum which is no less appropriate.

"(e) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated in Section 5150.

"(4) Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties.

"(5) If the court finds that it is an inconvenient forum and that a court of another state is a more appropriate forum, it may dismiss the proceedings, or it may stay the proceedings upon condition that a custody proceeding be promptly commenced in another named state or upon any other conditions which may be just and proper, including the condition that a moving party stipulate his consent and submission to the jurisdiction of the other forum.

"(6) The court may decline to exercise its jurisdiction under this title if a custody determination is incidental to an action for divorce or another proceeding while retaining jurisdiction over the divorce or other proceeding.

"(7) If it appears to the court that it is clearly an inappropriate forum it may require the party who commenced the proceedings to pay, in addition to the costs of the proceedings in this state, necessary travel and other expenses, including attorney's fees, incurred by other parties or their witnesses. Payment is to be made to the clerk of the court for remittance to the proper party.

"(8) Upon dismissal or stay of proceedings under this section the court shall inform the court found to be the more appropriate forum of this fact, or if the court which would have jurisdiction in the other state is not certainly known, shall transmit the information to the court administrator or other appropriate official for forwarding to the appropriate court.

"(9) Any communication received from another state informing the state of a finding of inconvenient forum because a court of this state is the more appropriate forum shall be filed in the custody registry of the appropriate court. Upon assuming jurisdiction the court of this state shall inform the original court of this fact."

The authority given is strictly to relinquish or stay when there is a finding it is an inconvenient forum. Subdivision (4) gives authority to communicate with the court of a sister state hopefully to reconcile any differences.

[8]Section 5157 deals generally with the clean hands doctrine which is not in issue in this case.

courts have on occasion held it an abuse of discretion not to stay proceedings where the other court is clearly the most convenient forum with access to relevant evidence (*Schlumpf* v. *Superior Court,* 79 Cal.App.3d 892 [145 Cal.Rptr. 190]; *Clark* v. *Superior Court, supra,* 73 Cal.App.3d 298). Nothing in the Uniform Act, however, gives a court the authority to determine it has a superior right to proceed where another court is also asserting jurisdiction. On the contrary, the Uniform Act provides a means to resolve the issue in an orderly manner without letting a state make factual rulings binding on another. Section 5155 reads as follows:

"(1) *A court of this state shall not exercise its jurisdiction under this title if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this title,* unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons.

"(2) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under 5159 and shall consult the child custody registry established under 5165 concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state.

"(3) If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with Sections 5168 through 5171. If a court of this state has made a custody decree before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the more appropriate forum." (Italics added.)

The Uniform Act was thus designed to solve this very problem of conflicting jurisdictions. The state which enjoys priority of time in

initiating the proceedings will proceed if the dispute is not resolved by agreement or consent of the other court.[9]

Moreover, where a custody decree has been made, section 5163, subdivision (1), becomes relevant. That provision reads: "(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction."

Professor Bodenheimer, the reporter for the committee which prepared the Uniform Law, interprets the effects of section 5163 (§ 14 of the Uniform Act) as follows: "A typical example is the case of the couple who are divorced in state A, their matrimonial home state, and whose children are awarded to the wife, subject to visitation rights of the husband. Wife and children move to state B, with or without permission of the court to remove the children. State A has continuing jurisdiction and the courts in state B may not hear the wife's petition to make her the sole custodian, eliminate visitation rights, or make any other modification of the decree, even though state B has in the meantime become the 'home, state' under section 3 [Civ. Code, § 5151(5)]. The jurisdiction of state A continues and is exclusive as long as the husband lives in state A unless he loses contact with the children, for example, by not using his visitation privileges for three years." (Bodenheimer, *Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand. L.Rev. 1207, 1237; see similar examples in Commissioner's Notes to § 3, Uniform Child Custody Jurisdiction Act.)

[9]The Code Commissioner's Notes to section 5155 (§ 6 of the Uniform Act) read in part: "Because of the havoc wreaked by simultaneous and competitive jurisdiction . . . this section seeks to avoid jurisdictional conflict with all feasible means, including novel methods. Courts are expected to take an active part under this section in seeking out information about custody proceedings concerning the same child pending in other states. In a proper case jurisdiction is yielded to the other state either under this section or under section 7 [§ 5156]. Both sections must be read together.

"When the courts of more than one state have jurisdiction under sections 3 [§ 5152] or 14 [§ 5163], priority in time determines which court will proceed with the action, but the application of the inconvenient forum principle of section 7 [§ 5156] may result in the handling of the case by the other court.

"While jurisdiction need not be yielded under subsection (a) if the other court would not have jurisdiction under the criteria of this Act, the policy against simultaneous custody proceedings is so strong that it might in a particular situation be appropriate to leave the case to the other court even under such circumstances. . . .

"Once a custody decree has been rendered in one state, jurisdiction is determined by sections 8 [§ 5157] and 14 [§ 5163]."

Substitute North Dakota for "A" and California for "B" and you have the present fact situation. All petitions for modification are to be addressed to the state which rendered the original decree if that state has jurisdiction under the standards of the Uniform Act (*In re Marriage of Schwander,* 79 Cal.App.3d 1013, 1019 [145 Cal.Rptr. 325]).

We can understand the trial judge's concern over California not being able to determine custody of its own residents and the possibility of multiple proceedings in the action. This very concern states have for their residents or for those merely within their borders has caused the interstate conflicts and thus prompted the Legislature to adopt the Uniform Act.

The Uniform Act permits the state which first obtained jurisdiction to exercise it. It does not shock the conscience that California must bow to North Dakota and yet appear to have greater access to the facts.[10] The North Dakota court may have abused its discretion in not permitting California to exercise jurisdiction. " '[T]here is no reason why [the] courts of one state should not be able to "assume with confidence that the courts of the other jurisdiction will act with wisdom and sincerity in all matters pertaining to the welfare of this child." [Citations.]' " (*Ferreira* v. *Ferreira,* 9 Cal.3d 824, 841, fn. 21 [109 Cal.Rptr. 80, 512 P.2d 304]; see also *In re Marriage of Steiner,* 89 Cal.App.3d 363, 372-373 [152 Cal.Rptr. 612].) In this connection, the statements of the referee related to the trial judge here do not necessarily establish the fact the North Dakota court will not exercise its jurisdiction substantially in conformity with this Uniform Act.

If California is the more appropriate forum for the custody decision because of the location of witnesses, etc., North Dakota should stay its proceedings and allow California to proceed (§ 5156). If the North Dakota trial court makes the wrong decision on whether to stay its proceedings, the appellate court of North Dakota should rectify the mistake. This is not the California trial or reviewing court function. The purpose of section 5156 is to provide the court with a tool to allow another court to go forward, not to create a confrontation or deny another court the authority to proceed. Were the roles of North Dakota and California reversed on these facts, we would expect the courts of North Dakota would require the proceedings in that state to be stayed (see *Bosse* v. *Superior Court,* 89 Cal.App.3d 440, 443-445 [152 Cal.Rptr. 665]; *In re Marriage of Kern,* 87 Cal.App.3d 402 [150 Cal.Rptr. 860]).

---

[10]Section 5156, subdivision (7), allows necessary travel expenses and costs of the parties and their witnesses in the more convenient forum.

The only exception noted in the Uniform Act for a state exercising jurisdiction contrary to this provision giving priority to the time the proceeding is initiated is where the child is abandoned or endangered (§ 5152, subd. (1)(c)) or where *no* forum has jurisdiction under the provisions. Neither of these conditions exists (§ 5152, subd. (1)(d)). While full faith and credit has never been given to foreign custody decrees by California courts (see 53 Harv.L.Rev. 1024, 1029), foreign decrees must be given "due consideration" on the grounds of comity (*Sampsell* v. *Superior Court,* 32 Cal.2d 763, 780 [197 P.2d 739]). The Uniform Act makes a comprehensive attempt to accommodate all these state interests (see *The Uniform Child Custody Jurisdiction Act and the Continuing Importance of Ferreira* v. *Ferreira,* 62 Cal.L.Rev. 365). It should be adhered to by our courts.

■ We hold under the facts of this case the California court was required to stay its proceedings under Civil Code section 5155, subdivision (1), because a custody proceeding was already pending in North Dakota and the relief sought amounted to a modification of the North Dakota decree when that state still had jurisdiction and had assumed it (§ 5163, subd. (1)(a)). North Dakota has continuing jurisdiction under the Uniform Act and the right to exercise it. There is nothing in the record to show North Dakota was not acting substantially in conformity with this Uniform Act.

Let a writ of prohibition issue directing the respondent San Diego County Superior Court to stay all proceedings in case number 421423 until such time as it may resume such custody proceedings in accordance with Civil Code section 5155 and the other sections of the Uniform Child Custody Jurisdiction Act and to vacate all orders made in connection with such proceedings.

Brown (Gerald), P. J., concurred.

**STANIFORTH, J.**—I respectfully dissent.

Professor Bodenheimer, writing in 1977,[1] anticipated the facts of this case when she observed:

---

[1]Professor Bodenheimer's views on this "danger"—presented after eight years' experience with the Uniform Act—are diametrically opposed to certain categorical statements expressed in the Code Commissioner's Notes to section 5155 (see fn. 9 of majority opinion) and in her 1969 article, *Uniform Child Custody Jurisdiction Act,* 22 Vand. L.Rev. 1207, 1237, relied upon by the majority. This "danger" has been perceived and described judicially as a "hiatus," a "dilemma" (*infra*).

"The child's temporary presence in a state on a visit does not confer custody jurisdiction under the Act. [Fn. omitted.] What would be the consequence if the visited state happens to be the state of the original decree that continues to have jurisdiction? Would the noncustodial parent who has remained in the state have an advantage and a chance to gain custody from the child's custodian who has moved away? It is generally acknowledged that the unfortunate tendency of courts to favor the local petitioner still persists. [Fn. omitted.] Thus the child would be exposed to the risk of having custody transferred to the visited parent.

"Exactly this danger was present and almost became a reality in *Moore v. Moore* [24 Ore.App. 673 (546 P.2d 1104)] . . . ." (Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Degrees, Joint Custody, and Excessive Modifications,* (1977) 65 Cal.L.Rev. 978, 995-996.)

The facts postulated and the exact "danger" feared by Professor Bodenheimer have at last become a reality in the majority opinion.

FACTS

The following are either wholly uncontradicted facts or factual conclusions amply supported by the record.

(1) The parties were divorced in North Dakota in 1974, and the mother was granted custody of two-year-old Scott.

(2) Shortly after the divorce, and with court approval, the mother moved with Scott to California.

(3) Since 1974, Scott has resided with his mother in California except during a six-month period in 1976 when by agreement Scott was with the father and during summer visitation periods which, on occasions, have been extended by the father's refusals to return the child at the end of the visitation period. On the occasion of each of these violations of the court order he has brought action in North Dakota courts seeking a change of custody.

(4) Thirty-four days after the North Dakota order changing temporary custody in such a proceeding the mother filed this action in California to establish the foreign judgment, modify visitation, and compel the father to dismiss his North Dakota proceeding.

(5) Concerning the jurisdictional basis of the North Dakota order, the California superior court judge (based upon the telephone communication between the two courts[2]) concluded: "He [the North Dakota referee] took the position that they have the child and that they had a previous custody order in force and effect and, therefore, he felt it would be proper for North Dakota to continue with the jurisdiction." And "Referee Dietz expressed to me on the phone that he felt the only issue in North Dakota was the fact that if in fact she was living with this man, that automatically that previous order vested custody in the father."

(6) In October 1978, after this telephonic dialogue, the North Dakota court found it had continuing jurisdiction under their similar Uniform Child Custody Jurisdiction Act (Uniform Act). After the father filed his petition for writ in this court, the North Dakota court awarded permanent custody of Scott to the father, subject to the mother's reasonable visitation rights, and terminated child support. This order on its face appears as a *sanction* for the mother's "wilful" failure to appear in North Dakota for a deposition.

(7) Concerning the critical fact issue of the "child's home state" (Civ. Code, § 5152, subd. (1)(a)), the court found: "The minor child is clearly domiciled in this State, has resided in this State in excess of one year and went back to North Dakota to visit with the father. The father during the visitation instituted proceedings in North Dakota for a change of custody. North Dakota was the original jurisdiction of the divorce and was the jurisdiction of a subsequent custody hearing. But after that custody hearing which was favorable to the mother, the mother established residence in this State and the child has been domiciled here and I think has been a resident and physically present for the majority of the last three and a half or four years."

(8) And concerning the "significant connection" test (Civ. Code, § 5152, subd. (1)(b)), the court found: "[Y]ou have a child who is domiciled, whose legal residence is here, whose mother is here, she has custody pursuant to a Court order, and that child goes back to North Dakota to visit with his father, there is no connection for that child and a North Dakota Court except the child is physically within the confines of that State visiting his father; then his father brings a custody action; . . ." and "[S]he got custody out of the North Dakota Court. Now, here we are for the third custody hearing in this case and for a child that has been living

[2]This communication is specifically authorized (Civ. Code, § 5156, subd. (4)) and encouraged (Civ. Code, § 5150, subd. (1)(b)) by the Uniform Act.

three and a half out of the last four years to have to go up to North Dakota and litigate it again doesn't make sense."

(9) Further, the court stated: "[T]he real nuts and bolts of a custody action where somebody challenges the fitness of the mother is to have the witnesses available who have firsthand knowledge as to what the living conditions are. In this situation, of course, the children's teachers are here; their doctor is here; their neighbors are here; anybody that would have any information about this case is here. . . . [I]f North Dakota continues with the jurisdiction in this case that the father doesn't have to come here, but the mother has to go there, but she goes absent witnesses. On the other hand, if this Court has jurisdiction in this custody action, he would have to come here, which is no more expensive than she going there, *but the witnesses would be here to bring to the attention of the trial Judge whatever the living conditions are for this child and what is best for this child.*" (Italics added.)

In light of these fact findings, the majority determination becomes a classic example of what the Uniform Act was intended to prevent. Such rule invites violation of the principal purpose of the Uniform Act, to wit: to discourage forum shopping and assure that litigation concerning custody takes place ordinarily in the state where the *child* has the closest connection and where significant evidence concerning the child's care is most readily available. These facts "crystalize[s] in a prototypical situation," the dilemma the Uniform Act was designed to prevent.

I

Before the enactment of the Uniform Act, the California Supreme Court confronted a situation remarkably similar to the case at bench. In *Ferreira* v. *Ferreira,* 9 Cal.3d 824 [109 Cal.Rptr. 80, 512 P.2d 304], the parties there had obtained a divorce decree in an Idaho court, awarding the custody of two minor children to the mother with reasonable visitation rights to the father. The mother remarried and moved with the children to Alabama; the father went to Delaware to complete his medical residency. While in Delaware both children visited the father, who, after the completion of his medical studies, left that state and settled together with the children in California. In California the father initiated several actions in order to modify the existing custody decree, mainly on the ground that if returned to Alabama, the children would be mistreated by their stepfather. In countering these moves, the mother filed an action in Alabama seeking the exclusive custody of the children. The Alabama

court granted the mother's petition and ordered that the father return the children to the mother's custody. The California court, in turn, awarded the temporary custody of the children to the resident father. The basic facts in *Ferreira* and the instant case are in a mirror image relationship. The child whose custody rests with the nonresident parent visited the forum state. The resident parent then seizes the opportunity to change custody from the nonresident parent by bringing an action for modification of the custody order in the forum state. Thereupon the nonresident parent launches a counteraction in his or her own state. Each state decides the case in favor of its own resident, which generates not only jurisdiction competition between the sister states, but also creates the potential for conflicting decisions with respect to the lawful custody of the child.

While recognizing the almost insoluble dilemma posed by forum shopping, conflicting adjudications and even child stealing, our Supreme Court concluded in *Ferreira* that in the factual setting there present, the "visitation state" [here North Dakota] should stay the proceedings to permit the final adjudication of the custody issue in the state [here California] of the nonresident parent; and even in case of compelling proof that the child's health and safety might be jeopardized if released to the nonresident parent having the custody right under an existing decree, the court in the "visitation state" may go no further than granting only temporary custody to the resident parent.

Since adoption by California of the Uniform Act, judicial interpretations of the Uniform Act, both in California and in courts of sister states, reach conclusions contrary to the majority's opinion. It is conceded as a threshold matter, the California court had unquestionable jurisdiction to proceed in the matter. The Uniform Act provides in pertinent part that "A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if . . . (a) This state . . . (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state." (Civ. Code, § 5152, subd. (1).) The case at bench clearly falls within the cited statute.

It is equally clear that North Dakota has jurisdiction to modify its original custody order. (*Bosse* v. *Superior Court,* 89 Cal.App.3d 440, 443 [152 Cal.Rptr. 665]; *Clark* v. *Superior Court,* 73 Cal.App.3d 298, 305, 307

[140 Cal.Rptr. 709]; *Moore* v. *Moore, supra,* 546 P.2d 1104, 1107; *Moran* v. *Moran* (N.D. 1972) 200 N.W.2d 263.)

The majority opinion at pages 466, 467, *ante,* resolves this concurrent jurisdiction problem in this statement: "The state which enjoys priority of time in initiating the proceedings will proceed if the dispute is not resolved by agreement or consent of the other court," and as authority for this conclusion cites the Code Commissioner's Notes to section 5155. This 1968 conclusion is not conformable with the California case law and decisions in sister states interpreting the act as well as more recent comment by learned annotators.

## II

The statutory point of beginning in the resolution of this conflict between courts of concurrent jurisdiction is Civil Code section 5155, which provides in pertinent part: "(1) A court of this state shall not exercise its jurisdiction under this title if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state *exercising jurisdiction substantially in conformity with this title,* unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum or for other reasons." (Italics added.)

These plain, explicit words compel the conclusion that the California court was obligated *to decline* to exercise its conceded jurisdiction over the custody matter if North Dakota was in fact exercising jurisdiction substantially in conformity with our act ("this title"). Conversely, if North Dakota was not "exercising jurisdiction" in conformity with our act, the California court was *not mandated* to decline to exercise its jurisdiction. This conclusion is buttressed by these further provisions of the act. Civil Code section 5163 provides in pertinent part: "(1) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) *it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title* or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction." (Italics added.) And the act further specifies: "The courts of this state shall recognize and enforce an initial or modification decree of a court of another state *which had assumed jurisdiction under statutory provisions substantially in accordance with this title* . . . ." (Civ. Code, § 5162; italics added.) Thus, section 5155 imposes the duty upon the *trial*

*court* of California to make that preliminary determination of whether North Dakota has "assumed jurisdiction substantially in conformity with this title." Nowhere in the act is there the least hint that the North Dakota court is delegated this function of determining whether the California court should decline to exercise its jurisdiction. It is a fundamental tenet of jurisprudence that a court has power and obligation to determine its own jurisdiction. (*Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 302 [109 P.2d 942, 132 A.L.R. 715].)

The act sets forth the *exclusive* method of determining subject matter jurisdiction in custody cases in California. (*In re Marriage of Ben-Yehoshua,* 91 Cal.App.3d 259, 264 [154 Cal.Rptr. 80].) The provisions of the act supersede any contrary decisional and statutory laws. (*In re Marriage of Steiner,* 89 Cal.App.3d 363, 371 [152 Cal.Rptr. 612]; *Smith* v. *Superior Court,* 68 Cal.App.3d 457, 461-462 [137 Cal.Rptr. 348]; *Neal* v. *Superior Court,* 84 Cal.App.3d 847, 850 [148 Cal.Rptr. 841].) Section 5152 was intended to limit jurisdiction in custody disputes.

Therefore, the superior court here was required to, and did in fact, look to the specific provisions in the act detailing the circumstances under which a California court should proceed to exercise its jurisdiction over a child custody matter as a basis for determining whether North Dakota was exercising jurisdiction "in conformity with 'this title'." If the superior court had found that the North Dakota court's exercise of its jurisdiction was authorized by "this title"—our act—then the California superior court was required to decline to exercise its jurisdiction.

Civil Code section 5152 defines those factual bases which do and do not confer jurisdiction on a California [or North Dakota] court to determine a custody issue. Section 5152, subdivisions (2) and (3) of the act specifically define the bases upon which jurisdiction over the custody issue may be exercised. First, it is noted that there is no provision in the act for jurisdiction to be established by reason of the presence of the parties or by stipulation or consent. The act expressly provides that the mere physical presence or the absence of the minor is neither a prerequisite to nor is it determinative of the custody issue. Nor is there any provision in section 5152 or anywhere in the act giving jurisdiction to a court on the basis of priority in filing the action. Any implied grant of jurisdiction on this basis would fly in the face of the express purpose of the act to deter abductions (Civ. Code, § 5150, subd. (1)(e)) to avoid jurisdiction competition (Civ. Code, § 5150, subd. (1)(a)) and to assure that litigation concerning custody take place in the state that has the

"closest connection" and where significant evidence is "most readily available" (Civ. Code, § 5150, subd. (1)(c)). Such rule would precipitate a "race for the courthouse" and invite the very "dangers" feared by Professor Bodenheimer.

The affirmative provisions of the act pertinent to this case which do govern jurisdiction are: "(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if conditions as set forth in any of the following paragraphs are met:

"(a) This state (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state.

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

". . . . . . . . . . . . . . . .

"(d)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

"(2) Except under paragraphs (c) and (d) of subdivision (1), physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

"(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody." (Civ. Code, § 5152, subds. (1)(a), (b), and (d); (2) and (3).)

When the father began his change of custody proceedings in North Dakota, Scott was present in North Dakota by reason of a court authorized temporary visit with the father. He had been residing, domiciled, going to school in California with his mother since the divorce in 1974 (except as noted above). Without any question California, not North Dakota, was the "home state" within the home state rule of section 5152, subdivision (1)(a).

Turning next to subdivision (1)(b) of section 5152 containing the "significant connection" test, it is established by the facts before the trial court that the child in this case did not have the requisite significant relationship to North Dakota but rather that California was the state having the maximum contacts as well as the readily available evidence concerning the child's care, etc. The child's home, friends, school, mother were in California. Thus, under both subdivisions (1)(a) and (1)(b) of section 5152, North Dakota did not have jurisdiction. The law as well as substantial evidence supports the trial court's conclusion on this issue.

Speculation concerning the "significant connection" the child has in North Dakota will not take the place of hard facts. Nor does conflict in the evidence on this point lead to any other conclusion but that this court is *bound* by the trial court's fact finding if supported by substantial evidence.

Turning next to subdivision (1)(d) of section 5152, it will be noted that substantial evidence supports the trial court's determination that North Dakota does not have jurisdiction under subparagraphs (a), (b) or (c) above. Concerning subdivision (1)(d)(ii), it will be noted that one of the requirements is that it be "in the best interest of the child that this [North Dakota] court assume jurisdiction." All authorities agree that in the interstate custody disputes, the interest of the child is paramount. (See Bodenheimer, *Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand.L. Rev. 1207, 1221; *Clark* v. *Superior Court, supra,* 73 Cal.App.3d 298, 308-309; *In re Marriage of Ben-Yehoshua, supra,* 91 Cal.App.3d 259, 267.)

In 9 Uniform Laws Annotated (1973) page 108, it is stated: "[J]urisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. *The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state. The submission of the parties to*

*a forum . . . is not sufficient without additional factors establishing closer ties with the state."* (Italics added.)

The appeal court in *Clark* v. *Superior Court, supra,* 73 Cal.App.3d 298, 308, approved this comment of Professor Bodenheimer in the Vanderbilt Law Review (Bodenheimer, *Uniform Child Custody Jurisdiction Act* (1969) 22 Vand.L.Rev. 1207, 1221): " 'As a general proposition the state in which there is the best opportunity to investigate the facts is most qualified to take jurisdiction.' [Citation]." Another commentator states as follows: " 'All discussions agree that in an interstate custody dispute the interests of the children are paramount. To increase the probability that a custody decision will be in the best interests of the child, the case should be decided in the court with the greatest access to the relevant evidence.' (Comment (1974) 62 Cal.L.Rev. 365, 371.)" *(Clark,* pp. 308-309.)

The court in *In re Marriage of Ben-Yehoshua, supra,* 91 Cal.App.3d 259, 267-268, stated: "Inherent in the notion of the best interests of the child are the criteria set forth in subdivision (1)(b) of section 5152 (significant relationship), which in this instance are determinative of the 'best interest' issue under subdivision (1)(d) of section 5152. For the reasons we have already stated, it is apparent that California has only minimum access to the facts relevant to the custody issue and that it is in the best interests of the children that California not assume to determine custody."

Here, substantial evidence, uncontradicted fact support the trial court's conclusion that California not only is the child's home state but that the significant relationships are here and the best interest of the child can be best investigated in California. From the record before this court, the conclusion drawn by the trial court is reasonable—North Dakota had only *minimal* access to facts concerning the *child.* The Uniform Act favors the state having the maximum contacts for determining the child's best interest. Much of the contact established by the child in North Dakota has resulted from the father's refusal to surrender the child at the end of visitation periods.

The foregoing analysis of critical facts in light of the Uniform Act point to one conclusion. The trial court was not mandated by the statutes or the facts here to decline jurisdiction or to find that jurisdiction did vest in the North Dakota court under any interpretation of section 5152. The foregoing construction of the Uniform Act is supported by a host of

California decisions as well as from sister state courts interpreting the Uniform Act. (See *Clark* v. *Superior Court, supra,* 73 Cal.App.3d 298; *In re Marriage of Ben-Yehoshua, supra,* 91 Cal.App.3d 259; *In re Marriage of Kern,* 87 Cal.App.3d 402 [150 Cal.Rptr. 860]; *Schlumpf* v. *Superior Court,* 79 Cal.App.3d 892 [145 Cal.Rptr. 890]; *Neal* v. *Superior Court,* 84 Cal.App.3d 847 [148 Cal.Rptr. 841]; *Bosse* v. *Superior Court, supra,* 89 Cal.App.3d 440; *Moore* v. *Moore, supra,* 546 P.2d 1104.)

No case has been found that supports the majority's interpretations of the Uniform Act. Reliance upon *Smith* v. *Superior Court,* 68 Cal.App.3d 457 [137 Cal.Rptr. 348], is misplaced for it is not factually or legally in point. But let the court in *Clark* v. *Superior Court, supra,* at pages 306-307, make the analysis: "In *Smith* v. *Superior Court* . . . , this court held that a California court, which had entered the initial custody decree, had jurisdiction to enforce a contempt order against the mother for violation of a modification decree giving the father certain visitation rights, which was entered upon her stipulation at a time when the child's home state was Oregon. There, unlike this case, the mother had appeared and taken part in proceedings before the California court without objecting to the jurisdiction until orders were made which she failed to obey. Here the mother has promptly objected to the jurisdiction of the local court." [Fn. omitted.]

Thus the key to understanding, approving of the *Smith* v. *Superior Court* decision is to be found in the concurring opinion of Sims, J.: "[J]urisdiction [for the contempt proceedings] over the person of petitioner, who voluntarily appeared and stipulated to a change in the custody order, was conferred by sections 410.10 and 410.50 of the Code of Civil Procedure." (*Id.,* at p. 466.) Professor Bodenheimer explains the *Smith* decision in essentially the same terms. (Bodenheimer, 65 Cal.L. Rev., *supra,* pp. 999-1000.)

### III

The trial court, after consultation with the North Dakota court (referee) and hearing the evidence, determined that California was not an inconvenient forum under section 5156 of the Uniform Act. The same facts supporting the judge's conclusion that North Dakota was *not* exercising its jurisdiction "substantially in conformity with this title" (§§ 5155, 5152) supports the court's conclusion it was not required to pass the jurisdictional power it possessed to North Dakota through the inconvenient forum rule. This procedure followed by the court was the

last in the multistep (3) process a trial court must follow in determining whether to exercise jurisdiction under the Uniform Act. (*Clark* v. *Superior Court, supra,* 73 Cal.App.3d 298, 308; *Carson* v. *Carson,* 29 Ore.App. 861 [565 P.2d 763]; *Moore* v. *Moore, supra,* 546 P.2d 1104.)

As was said in *In re Marriage of Kern, supra,* 87 Cal.App.3d 402, 410: "Lastly, the Uniform Act expressly authorizes the stay or dismissal of the proceeding by the forum state if another state is a more appropriate forum to decide the matter. [Fn. omitted.]

"We are, of course, well aware of the general proposition that whether the trial court stays the proceedings on the grounds of forum non conveniens is purely discretionary, and that the ruling of the trial court will not be disturbed on appeal unless there is a clear abuse of discretion [citations]."

## IV

One further matter deserves attention. The father's claim of jurisdiction in North Dakota is based also upon orders which are facially, by definition, punitive. (*Settle and Settle,* 25 Ore.App. 569 [550 P.2d 445, 447].) The 1977 North Dakota order provided for a change of custody of the child, in future, without hearing, upon the happening of events having no necessary relationship to the best interest of the child. Such a change of custody would have at its base the desire to punish the mother because the North Dakota court was insulted by her disregard of its authority. Such punitive orders are invalid. (See, e.g., *McDowell* v. *Orsini,* 54 Cal.App.3d 951, 963-964 [127 Cal.Rptr. 285]; *Forslund* v. *Forslund,* 225 Cal.App.2d 476 [37 Cal.Rptr. 489].)

As noted in *Miller* v. *Superior Court,* 22 Cal.3d 923, 930 [151 Cal.Rptr. 6, 587 P.2d 723], a *temporary* order changing custody without immediate showing of the child's welfare may be nonpunitive; but the 1977 court order here with its automatic change of custody provision is not a temporary order. It regulates the mother's conduct and the child's custody without reference to Scott's welfare. It is therefore arbitrary and punitive.

"Although the Uniform Act requires recognition and enforcement of out-of-state custody decisions in general, punitive decrees do not command the respect that is due other out-of-state custody decrees and *should not be recognized under the Act.* Punitive decrees are disfavored because

they disrupt the stability and continuity of the child's environment." (Bodenheimer, *op. cit., supra,* pp. 1003-1004; italics added.)

In determining the custody of children, the courts are not engaged in a disciplinary action to punish parents for their shortcomings. Custody is to be awarded to either parent according to the best interest of the child. (*In re Marriage of Stoker,* 65 Cal.App.3d 878, 881 [135 Cal.Rptr. 616]; *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211, 217 [286 P.2d 983].)

There is no finding by *any court* nor even any suspicion that the mother's lifestyle[3] or her failure to respond to a subpoena re deposition directing her to appear in a lawyer's office in North Dakota touch upon, affects the child's upbringing in any respect good or bad. Such an order "should not be recognized under the Act."

In sum, the majority opinion has ignored that profound central concept of our law, wherever it touches upon a child's custody: The best interests of the child govern; the interest or desires of parents, even the dignity of the court is subordinate. (Civ. Code, § 5150, subd. (1)(c); Comrs. Notes to the U. Child Custody Jur. Act, 9 U. Laws—Ann. (1973) § 3, p. 108.)

I would deny the petition for writ of mandate.

---

[3]During the pendency of this action, the mother and Ross Moody—his impediments to matrimony removed—have become husband and wife.