NANCY J. RANGE, APPELLANT, V. J. MARTIN RANGE, APPELLEE.
440 N.W.2d 691

Filed June 2, 1989. No. 88-882.

Richard F. Welling and Alan M. Thelen, of Breeling & Welling, for appellant.

Chris M. Arps, of Arps & Schirber Law Offices, for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and SPRAGUE and MULLEN, D. JJ.

BOSLAUGH, J.

The petitioner, Nancy J. Range, now Nancy Loftus, has appealed from the order of the district court modifying its decree of May 10, 1985, as previously modified on June 18, 1986, so as to award custody of Nicole D. Range to the respondent, J. Martin Range, and fixing the child support for the children still in the custody of the petitioner at $146 per month.

The marriage of the parties was dissolved by the decree of May 10, 1985. Custody of the minor children of the parties, Kristi M. Range, born September 7, 1972; Nicole D. Range, born April 30, 1974; Jaymi L. Range, born March 24, 1977; and Karri N. Range, born January 23, 1980, was awarded to the parties jointly, with possession awarded to the petitioner.

On June 18, 1986, the decree was modified by awarding sole custody of Kristi to the respondent and sole custody of the other children to the petitioner. The petitioner was granted leave to remove the three children in her custody from Nebraska, and child support and visitation rights were determined.

On October 23, 1987, the respondent filed an application to further modify the decree so as to transfer custody of Nicole from the petitioner to the respondent. On November 9, 1987, the trial court awarded temporary custody of Nicole to the respondent by an ex parte order and appointed a guardian ad litem for Nicole.

On November 13, 1987, the petitioner filed a "Special Appearance," alleging that the district court did not have personal jurisdiction over the petitioner or jurisdiction over the subject matter. The petitioner prayed that, among other things, the application be dismissed.

An amended application was filed on November 20, 1987, and a second "Special Appearance" was filed on December 30, 1987. The special appearance was overruled on January 8, 1988.

A second amended application, which was positively verified, was filed on January 26, 1988. A third "Special Appearance" was filed on March 3, 1988, and a "Responsive Pleading" on March 22, 1988.

On September 6, 1988, the trial court found that there had been a substantial change of circumstances and that it was in the best interests of Nicole D. Range that her custody be changed from the petitioner to the respondent. It is from this order that the petitioner has appealed.

The petitioner's assignment of error is that the trial court "erred in finding that it had jurisdiction over the subject matter and persons at issue in the Appellee's Amended Application to Modify."

So far as jurisdiction over the person of the petitioner is concerned, each of the special appearances filed by the petitioner requested affirmative relief and constituted a general appearance. A motion invoking the power of the court on any question other than jurisdiction over the person constitutes a general appearance and confers jurisdiction over the moving

party. *State v. Wedige*, 205 Neb. 687, 289 N.W.2d 538 (1980).

The petitioner's contentions in regard to jurisdiction over the subject matter are based on the provisions of the Nebraska Child Custody Jurisdiction Act, Neb. Rev. Stat. §§ 43-1201 to 43-1225 (Reissue 1988). The petitioner argues that since Georgia is now the home state of Nicole, and her only "significant connections" are with the State of Georgia, the district court for Sarpy County had no jurisdiction to modify the decree on September 6, 1988. The petitioner relies on *Mace v. Mace*, 215 Neb. 640, 341 N.W.2d 307 (1983), as supporting her contentions.

There are substantial differences between this case and the *Mace* case. The children involved in *Mace* were much younger and had moved to Nebraska with their mother immediately following the award of custody to her. All of the evidence concerning their lives and care while in the custody of their mother was in Nebraska, which had become their home state.

Section 43-1203 is the section relating to initial or modification jurisdiction. Subsection (a) relates to jurisdiction based upon this state being the "home state" of the child. Subsection (b) provides:

It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his or her parents, or the child and at least one contestant, have a significant connection with this state and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

Section 43-1214(1) provides:

If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with sections 43-1201 to 43-1225 or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction.

A number of courts have held that this provision of the uniform act establishes a strong preference for the state which

originally determined custody to exercise its continuing jurisdiction if the requirements of § 43-1203(b) are satisfied.

In *Kumar v. Superior Court of Santa Clara Cty.*, 32 Cal. 3d 689, 652 P.2d 1003, 186 Cal. Rptr. 772 (1982), the Supreme Court of California held that New York, which had rendered the initial custody decree, had continuing jurisdiction to modify its custody decree and California had no authority to modify the decree. In that case the court said at 32 Cal. 3d at 695-96, 652 P.2d at 1006-07, 186 Cal. Rptr. at 775-76:

> The jurisdictional grounds for making a child custody determination are set out in section 5152 of the Uniform Act. Sections that follow address due process rights of the parties and prescribe appropriate procedures. Other sections, crucial to our determination, articulate the circumstances or situations in which the courts may or should decline to *exercise* jurisdiction. The sections relied upon by Jitendra (§§ 5155, 5157, and 5163) fall in the latter category. We stress this point because both parties speak of either California or New York as lacking "jurisdiction" to act in the instant matter, when the crucial question is really whether the Uniform Act directs or allows exercise of jurisdiction. As shall appear, it is obvious that each state can claim to have jurisdiction from among the multifaceted components of section 5152. Indeed, this case is a good example of the "jurisdictional competition and conflict" (§ 5150) which the Uniform Act was designed to alleviate.

> While the courts have given lip service to the policies provided by the Uniform Act, some have been reluctant to forego what they see as concurrent jurisdiction to proceed under the act. In no area has the confusion been greater than in the modification of out-of-state custody decrees.

> Consistent with its goal of avoiding "relitigation of custody decisions of other states in this state insofar as feasible" (§ 1, subd. (6); Civ.Code, § 5150, subd. (f)), the Uniform Act commands in section 13 (Civ.Code, § 5162) that the courts of this state shall recognize and enforce "an initial or modification decree" of a court of another state which had assumed jurisdiction under the terms of the act.

The next section, section 14 of the Uniform Act (Civ.Code, § 5163), governs the authority of California to modify an out-of-state decree. Section 5163 provides: "(1) If a court of another state has made a custody decree, a court of this state *shall not modify that decree* unless (a) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this title or has declined to assume jurisdiction to modify the decree and (b) the court of this state has jurisdiction." (Emphasis added.)

Professor Bodenheimer, reporter for the special committee which drafted the Uniform Act, interpreted the section's language—"this state shall not modify"—as meaning precisely what it says: "In other words, the continuing jurisdiction of the prior court is exclusive. Other states do not have jurisdiction to modify the decree. They must respect and defer to the prior state's continuing jurisdiction. Section 14 is the key provision which carries out the Act's two objectives of (1) preventing the harm done to children by shifting them from state to state to relitigate custody, and (2) preventing jurisdictional conflict between the states after a custody decree has been rendered. . . . [¶] Exclusive continuing jurisdiction is not affected by the child's residence in another state for six months or more. Although the new state becomes the child's home state, significant connection jurisdiction continues in the state of the prior decree where the court record and other evidence exists and where one parent or another contestant continues to reside. *Only when the child and all parties have moved away is deference to another state's continuing jurisdiction no longer required.*" (Emphasis added; Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA* (1981) 14 Fam.L.Q. 203, 214-215.)

The court further stated at 32 Cal. 3d at 698-700, 652 P.2d at 1009-10, 186 Cal. Rptr. at 778-79:

Thus, in accord with the letter of section 5163 and its purpose "to achieve greater stability of custody

arrangements and avoid forum shopping" (9 U.Laws Annot. (1979 ed.) p. 154, Commrs. Note), *all* petitions for modification must be addressed to the state which rendered the original decree if that state had and retains jurisdiction under the standards of the act. (*Id.*; *Palm v. Superior Court* (1979) 97 Cal.App.3d 456, 468, 158 Cal.Rptr. 786; *In re Marriage of Schwander* (1978) 79 Cal.App.3d 1013, 1019, 145 Cal.Rptr. 325.)

In support of her claim that California has jurisdiction to modify the New York decree, Yvonne relies upon what has been termed the "myth of concurrent modification jurisdiction." (Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA, supra*, 14 Fam.L.Q. 203, 216.) Under Yvonne's analysis, one starts with section 5152, rather than section 5163: California has jurisdiction as Sunjay's "home state" (§ 5152, subd. (1)(a)); New York has some connection with Sunjay (§ 5152, subd. (1)(b)). Yvonne then considers which forum has greater connection with the child and concludes, as did the trial court, that California has the "closest" connections.

Yvonne is not alone in the confusion engendered by the failure to recognize the applicability of section 5163 whenever a *modification* of jurisdiction is involved. California appellate courts have played some part in perpetuating the myth of concurrent modification jurisdiction. The confusion can be avoided by clearly distinguishing between initial and modification jurisdiction.

*Initial* jurisdiction is determined by the guidelines of section 5152, which point to the state with the closest connections to the child and to information about his present and future well-being. *Modification* jurisdiction is perhaps best viewed as an extension of the recognition and enforcement provisions of the Uniform Act. (§ 5162; Bodenheimer, 65 Cal.L.Rev. 978, 983-984.) California is not effectively enforcing the New York decree if it modifies the decree as soon as the child has spent six months within its borders. Under section 5163, the strong

presumption is that the decree state will continue to have modification jurisdiction until it loses all or almost all connection with the child. If that state has lost contact, the analysis begins again with section 5152 to determine which other state has closest contact.

Application of the provisions of section 5163 to the instant case compels the conclusion that New York has continuing jurisdiction to modify its decree so long as Jitendra resides there and continues to assert and exercise his custody/visitation rights.

See, also, *In re Marriage of Leyda*, 398 N.W.2d 815 (Iowa 1987); *In re Marriage of McEvoy*, 414 N.W.2d 855 (Iowa App. 1987); *Kraft v. District Ct.*, 197 Colo. 10, 593 P.2d 321 (1979); *Clark v. Kendrick*, 670 P.2d 32 (Colo. App. 1983); *Clarke v. Clarke*, 126 N.H. 753, 496 A.2d 361 (1985); *Pitts v. Sutter*, 408 So. 2d 105 (Ala. Civ. App. 1981); *Bloodgood v. Whigham*, 408 So. 2d 122 (Ala. Civ. App. 1981); *Jefferson v. Downs*, 107 Misc. 2d 852, 436 N.Y.S.2d 169 (1981); *Neger v. Neger*, 93 N.J. 15, 459 A.2d 628 (1983).

Contrary to the contentions of the petitioner, the record in this case shows that Nicole has substantial and significant connections with Nebraska. Nicole was born in Nebraska and has lived most of her life in Nebraska. She has grandparents and uncles and aunts in Nebraska, but has no relatives in Georgia other than her mother and sisters.

At the time of the hearing, Nicole was over 14 years of age. The record shows that she is extremely bright and performs well scholastically. She has a pleasant personality and makes friends easily. At the hearing, she expressed a strong preference to live with her father and older sister in Nebraska. She is not a child who is very young and unable to make a reasoned decision.

Another substantial contact which both the respondent and Nicole have with Nebraska is the fact that the Sarpy County District Court and Judge Thompson have been involved in this case since the original divorce petition was filed in May 1985. Judge Thompson heard the modification application which resulted in the June 1986 order modifying the decree, and granted custody of the oldest daughter to the father. This is the third time the parties have been before this district court and

this district court judge.

The respondent is employed by Fruehauf Corporation and has rejected several promotions so that he would not have to move from Nebraska. He has consistently exercised his visitation rights.

The petitioner has remarried, and Nicole has had difficulty with the petitioner's new husband. Some friction has developed between Nicole and her mother and the two younger sisters.

The respondent testified that in the summer of 1987, Nicole was in Nebraska for 38 days for her visitation with him. At that time she wanted to stay in Nebraska, but he insisted that she return to Georgia and discuss the matter with the petitioner. Nicole did so and told the respondent that the petitioner had said she could stay in Nebraska. The respondent then sent a plane ticket to Georgia, and Nicole returned to Nebraska on August 15, 1987. The respondent enrolled Nicole in school and made arrangements for her medical, dental, and orthodontal care. According to Nicole, the petitioner had told her that "whatever I wanted to do was fine with her and it was my decision . . . ."

The petitioner testified that she allowed Nicole to return to Nebraska for only a temporary period. Apparently, as a result of the misunderstanding, the petitioner returned to Nebraska on November 9, 1987, and armed with a copy of the order of modification of June 18, 1986, and accompanied by a policeman, took Nicole out of school, gathered up Nicole's belongings at the respondent's home, and returned to Georgia with Nicole.

The guardian ad litem urged the trial court to respect the request of Nicole to be allowed to return to Nebraska and live with her father and older sister.

The record supports the finding that it is in the best interests of Nicole that her custody be transferred from the petitioner to the respondent, that the district court for Sarpy County, Nebraska, had jurisdiction of the subject matter of the application and of the person of the petitioner, and that the award of custody to the respondent was not an abuse of discretion. For those reasons, the judgment of the district court is affirmed.

AFFIRMED.